IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 1:80-cv-369 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **Order Granting Plaintiff's Motion to** |
| | : | **Modify the Consent Decree** |
| City of Cincinnati, *et al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

This matter is before the Court on the United States' Motion to Modify the Consent Decree (Doc. 193); Defendants the City of Cincinnati's, the Cincinnati Police Department's, and the members of the Cincinnati Civil Service Commission's response in opposition (Doc. 194); and the United States' reply (Doc. 197).  The Consent Decree at issue contains race-based and sex-based hiring and promotional goals.  The United States contends the Consent Decree must be modified by removing these goals, as they allegedly violate the Equal Protection Clause.  Defendants oppose modification, asserting the goals pass constitutional muster.  For the reasons that follow, the Court **GRANTS** the United States' Motion.

I.      BACKGROUND

        A.      Facts

        Initially, the Court notes that neither party disputes the underlying facts.  This case involves a 1981 Consent Decree entered into by the City of Cincinnati, the Cincinnati Police Department ("CPD"), members of the Cincinnati Civil Service Commission (collectively, the "City"), Queen City Lodge No. 69, Fraternal Order of Police, and the United States.  The Consent Decree resulted from a 1980 complaint filed by the United States alleging the City

discriminated against African-American and female applicants in its employment practices for entry-level police hiring and promotions to sergeant.  (Doc. 184-1 at PageID 22; Doc. 193 at PageID 55–56.)

The purpose and intent of the Consent Decree is to ensure that African-American and female applicants are not disadvantaged by CPD's employment practices, and that any such disadvantage "which may have resulted from past discrimination is remedied so that equal employment opportunity is provided to all." (Doc. 184-1 at PageID 24.)  Pursuant to this purpose, the Consent Decree contains a long-term goal of having African Americans and women in all sworn ranks of CPD, subject to the availability of qualified applicants, reach the proportions of qualified African Americans and women in the labor force of the City of Cincinnati.[1]  (*Id.*)

The Consent Decree also provides for a series of "interim measure" numerical hiring and promotional goals regarding African Americans and women.  In particular, the Consent Decree established the following numerical goals to be met on an annual basis: (1) vacancies for entry-level sworn police officer positions are to be filled with qualified applicants in the proportion of, at a minimum, 34% African American and 23% female;[2] and (2) approximately 25% of vacancies for the police sergeant position are to be filled with qualified African-American and

---

[1] The Consent Decree does not contain any explicit termination date; rather, once five years had elapsed after entry of the Consent Decree, the City could notify the United States of its desire to terminate the Consent Decree. (Doc. 184-1 at PageID 33.)  Once the City provides such notice and it is shown that the Consent Decree's goals have been achieved, the Consent Decree "shall be terminated." (*Id.*)  To date, the City has never provided such notice. (Doc. 193 at PageID 56.)

[2] These percentages were derived from the composition of CPD's 1980 police recruit list. (Doc. 184-1 at PageID 24.)

2

female candidates.[3]  (Doc. 184-1 at PageID 24–25, 28–30.)  These two goals are the focus of the

United States' instant motion.

Both the United States and the City recognize that the Consent Decree has positively

affected the composition of CPD.  In July 1980, 9.9% of CPD's sworn workforce was African

American and 3.4% was female.  (Doc. 193 at PageID 57; Doc. 194 at PageID 78.)  As of

January 2021, CPD's sworn workforce was approximately 28.3% African American and 22.9%

female, the police officer position was 31.3% African American and 23.9% female, and the rank

of sergeant was 28.4% African American and 15.3% female.[4]  (Doc. 194-1 at PageID 175; Doc.

197-1 at PageID 208–09.)

The United States previously approached the City regarding possible modification or

dissolution of the Consent Decree (Doc. 193 at PageID 58; Doc. 194 at PageID 71.)  The parties

engaged in several discussions regarding a potential mutually agreeable modification, and

although the City "strongly concurs with the United States' position that CPD's practices, which

are based on the Consent Decree, should be modernized," the parties failed to reach an

agreement.  (Doc. 194 at PageID 71; Doc. 193 at PageID 58.)

B.      **Procedural Posture**

On February 16, 2021, the United States moved to reopen the instant case in light of

related litigation in *Kohler v. City of Cincinnati, et al.*, 1:20-cv-00889 (S.D. Ohio).  (Doc. 184.)

---

[3] According to the City, in practice the promotional process works as follows.  A promotional list is first determined
through competitive exam.  (Doc. 194 at PageID 70.)  After every fourth promotion made based on the promotional
list, CPD reviews the group of four to determine whether an African-American or female candidate was promoted.
(*Id.*)  If no such individuals are represented in the group of four, the next qualified African American or woman on
the promotional list is promoted to sergeant, and this position is referred to as the "double-fill."  (*Id.*)

[4] These percentages have remained consistent over the past decade.  In January 2010, CPD's sworn workforce was
approximately 29.7% African American and 22.4% female, the police officer position was 35.2% African American
and 24.4% female, and the rank of sergeant was 27.4% African American and 12.8% female.  (Doc. 194-1 at PageID
177.)

The City did not oppose this request, but rather welcomed this Court's assistance as "the City

works . . . with the United States to bring the terms of the Decree into this century." (Doc. 190 at

PageID 47–48.)  The Court granted the United States' motion.  (Doc. 191.)  Thereafter, the

United States filed this instant motion seeking removal of the numerical hiring and promotional

goals contained in paragraphs 2(A)-2(B), 3(B)(4), 3(C)(4), and 5[5] of the Consent Decree (Doc.

193), and the City filed a response in opposition (Doc. 194).  This matter is now ripe for this

Court's review.

## II.      STANDARD OF REVIEW

A consent decree is a "strange hybrid in the law" in that it is "a contract that has been

negotiated by the parties" while simultaneously being "a court order which can be changed by a

court if circumstances warrant."  *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981).  A district

court "is not merely an instrument of a consent decree or of the parties' stipulations with respect

to it.  The court instead has discretion with respect to whether and how a consent decree shall

remain in effect, including the discretion to terminate the decree altogether."  *Cleveland*

*Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 741 (6th Cir. 2012).

Thus, a consent decree is properly described as "a settlement agreement subject to continued

judicial policing."  *Lorain NAACP v. Lorain Bd. of Edu.*, 979 F.2d 1141, 1148 (6th Cir. 1992);

*see also Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994)

(noting that even if a consent decree does not expressly grant the court jurisdiction to modify the

decree, the court retains the inherent power to do so).

---

[5] The United States motion requests the removal of paragraph "3(C)(5)" from the Consent Decree, but the Consent Decree contains no such paragraph.  Given that paragraph 5 also addresses the Consent Decree's race-based and sex-based goals, as well as the proximity of paragraph 5 to paragraph 3(C)(4), the Court construes the United States' motion as requesting removal of paragraph 5.

The Supreme Court has established a "flexible" two-part standard for modification of a consent decree. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383, 393 (1992). First, the party seeking modification bears the burden of establishing that a "significant change in facts or law warrants revision of the decree." *Id.* at 393. Changes in statutory or decisional law constitute a sufficient basis for modification if the change "make[s] legal what the decree was designed to prevent" or if an obligation pursuant to the consent decree "has become impermissible under federal law." *Id.* at 388; *see also United States v. Wayne Cnty., Mich.*, 369 F.3d 508, 515 (6th Cir. 2004). Once this initial burden is satisfied, the district court is to "consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393; *see also Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th Cir. 2011).

The Sixth Circuit has explained why *Rufo*'s "less stringent modification standard" is justified for modification of "consent decrees entered in settlement of so-called 'institutional reform' litigation involving and affecting the operation of governmental institutions or organizations." *Lorain NAACP*, 979 F.2d at 1149. First, institutional consent decrees "affect more than the rights of the immediate litigants." *Id.* (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)). Second, broad judicial discretion is desirable "so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal." *Id.* (quoting *Heath*, 888 F.2d at 1109). And finally, a court needs the ability to modify institutional consent decrees because "such decrees often remain in place for extended periods of time, [and therefore] the likelihood of significant changes occurring during the lifetime of the decree is increased." *Id.* (quoting *Rufo*, 502 U.S. at 380).

### III.    LAW AND ANALYSIS

#### A.    Modification of the Consent Decree[6]

The Court now will turn to the issue of whether the Court must modify the Consent

Decree to remove the race-based and sex-based goals.  The Court will first consider the race-

based goals, and then the sex-based goals.  By way of background, the Consent Decree's race-

based and sex-based hiring and promotional goals have been in effect for over 40 years.

Throughout this time, CPD has witnessed an increase in both African-American and female

police officers and sergeants.  Although at one time the hiring and promotional goals passed

constitutional muster, that time has passed.  As explained further below, the City has failed to

carry its burden establishing a compelling interest to justify continued use of the race-based goals

or an important governmental interest to justify continued use of the sex-based goals.  Pursuant

---

[6] The parties dispute whether, given the current record before the Court, the Consent Decree can be modified.  The City contends that the Court must first make a determination that there has been compliance with the Consent Decree and that the requisite goals have been satisfied, and that at this stage the record has not been sufficiently developed. (Doc. 194 at PageID 73–74.)  This, however, is not the case.  It is true that such a finding is a prerequisite to terminate a consent decree.  *See Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998) ("[A] district court may not terminate its jurisdiction until it finds both that Defendants are in compliance with the decree's terms and that the decree's objectives have been achieved.").  The City, however, misconstrues the relief the United States requests.  The United States is not seeking to terminate the Consent Decree; rather, the United States desires for the Consent Decree to remain in place and only asks the Court to modify the Consent Decree by removing the race-based and sex-based hiring and promotional goals. (Doc. 197 at PageID 186.)  Modification of a consent decree is governed by the two-part standard articulated in *Rufo*.  502 U.S. at 393.  The Sixth Circuit has held, however, that due to the significance of modifying the terms of a consent decree over the objection of one of the parties, where one party to a consent decree objects to a proposed modification, the district court must hold a "complete hearing" and make "appropriate findings of fact before making such modifications." *Wayne Cnty.*, 369 F.3d at 512 (citing *Vanguards of Cleveland*, 23 F.3d at 1017); *see also Bradley v. Milliken*, 772 F.2d 266, 271 (6th Cir. 1985) ("A hearing is generally required before a district court may modify a consent decree.").  Yet the Sixth Circuit has also made clear that a "'complete hearing' of an issue does not necessarily require a full-blown evidentiary hearing." *Gonzales*, 151 F.3d at 535; *see also Ford Motor Co. v. Mustangs Unlimited, Inc.*, 420 F. App'x 522, 526 (6th Cir. 2011).  "Evidentiary hearings are not necessary where the parties' briefs clearly set forth the relevant facts and arguments of a case such that a hearing would not add anything to the briefs, and where the court has sufficient evidence before it to make detailed factual findings." *Gonzales*, 151 F.3d at 535.  Here, the record is sufficiently developed such that the Court can rule on the United States' motion.  The parties' briefs adequately set forth applicable legal standards and relevant facts regarding the Consent Decree's race-based and sex-based hiring and promotional goals and CPD's demographics.

to the reasons addressed below, the Court finds the Consent Decree must be modified by removing these goals.[7]

### i.     Race-Based Hiring and Promotional Goals

Turning first to the issue of the race-based goals, the United States has met its initial burden under *Rufo* to show modification is warranted.  The parties do not dispute that the legal landscape governing race-based affirmative action has been significantly altered since the time the Consent Decree was initially entered.  The Consent Decree was approved in 1981, at which time "[t]he Supreme Court had . . . just begun to address the constitutionality of affirmative action." *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1564 (11th Cir. 1994) (analyzing similar 1981 consent decree) (citing cases).  Subsequently, in 1989 the Supreme Court held in *Richmond v. J.A. Croson Co.* that all race-based action by state and local governments is subject to strict scrutiny irrespective of the race of those burdened or benefited by the action.  488 U.S. 469, 493–94 (1989); *see also Adarand Constructors v. Pena*, 515 U.S. 200, 221–22 (1995).  Pursuant to *Croson* and its progeny, the Sixth Circuit has held that "[r]acial classifications in consent decrees are subject to strict scrutiny just like any other" governmental race-classifications. *Cleveland Firefighters*, 669 F.3d at 741.  Accordingly, the United States has satisfied its initial burden under *Rufo*.

The Court must therefore determine, pursuant to *Rufo*'s second prong, whether removal of the race-based hiring and promotional goals is a suitably tailored modification.  If the goals do not withstand strict scrutiny and thus violate the Equal Protection Clause, removal of the goals is

---

[7] The Court also rejects the City's insistence that the race-based and sex-based goals do not violate the Equal Protection Clause because they do not harm non-minority officers. (Doc. 194 at PageID 75–77.)  The Consent Decree's hiring and promotional goals at issue contain race-based and sex-based classifications, and the City does not dispute this point.  All governmental policies utilizing racial and sex-based classifications are "presumptively invalid" and must be reviewed under strict scrutiny and intermediate scrutiny, respectively. *Vitolo v. Guzman*, 999 F.3d 353, 360, 364 (6th Cir. May 27, 2021).

a constitutionally required modification.  To survive strict scrutiny, race-based governmental

action must be narrowly tailored to achieve a compelling governmental interest.  *Parents*

*Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).  Strict

scrutiny is a "very demanding standard, which few [government policies] will survive."  *Vitolo v.*

*Guzman*, 999 F.3d 353, 360 (6th Cir. May 27, 2021).  The burden is on the party defending the

governmental action to satisfy both requirements.  *See Fisher v. Univ. of Tex. at Austin*, 570 U.S.

297, 310–12 (2013);[8] *see also Vitolo*, 999 F.3d at 360–62; *Aiken v. City of Memphis*, 37 F.3d

1155, 1162 (6th Cir. 1994) ("When, as here, a race-based affirmative action plan is subjected to

strict scrutiny, the party defending the plan bears the burden of producing evidence that the plan

is constitutional").  Merely stating that a compelling interest exists is insufficient; the party

defending the race-based action must demonstrate "a strong basis in evidence" that a compelling

interest actually exists which justifies the remedy.  *Rutherford v. City of Cleveland*, 179 F. App'x

366, 373 (6th Cir. 2006).

The City points to two purported compelling interests justifying the Consent Decree's

race-based hiring and promotional goals: (1) a compelling interest in remedying the lingering

effects of past discrimination (Doc. 194 at PageID 78–79) and (2) a compelling interest in

maintaining a diverse police department (*id.* at PageID 79–82).  As explained below, neither

basis withstands strict scrutiny.

---

[8] The Court notes that the parties dispute the applicable burden of proof.  The United States contends that the burden is on the City to demonstrate that the race-based goals survive strict scrutiny (Doc. 193 at PageID 62; Doc. 197 at PageID 188–91), while the City argues the ultimate burden of proving unconstitutionality lies with the United States (Doc. 194 at PageID 71–72).  There is some support for the City's position. *See Rutherford v. City of Cleveland*, 179 F. App'x 366, 373–74 (6th Cir. 2006) ("[T]he party defending the remedy bears the initial burden of demonstrating a 'strong basis in evidence' that a compelling governmental interest exists which justifies the remedy . . . If the defending party meets its initial burden, then the burden shifts to the party challenging the remedy to prove its unconstitutionality."). *Rutherford*, however, predates the Supreme Court's decision in *Fisher*.  And even assuming the City is correct that the burden shifts to the United States once the City produces evidence of a compelling interest, the Court finds that the City has failed to satisfy its initial burden for the reasons explained herein.

It is well-established that "remedying past and present discrimination by a state actor" constitutes a compelling interest for purposes of strict scrutiny.  *United States v. Paradise*, 480 U.S. 149, 167 (1987); *see also Cleveland Firefighters*, 669 F.3d at 742 ("Remedying the effects of past intentional discrimination is a compelling interest." (cleaned up)).  In support of its position, the City indicates that in connection with the entry of the Consent Decree in 1981 the parties "stipulated to evidence that demonstrates past discrimination in the hiring and promotional practices of CPD."  (Doc. 194 at PageID 78.)  The City's assertion is reinforced by CPD's demographics which reveal that as of July 1980, 9.9% of CPD's sworn workforce was African American.  (Doc. 193 at PageID 57; Doc. 194 at PageID 78.)

Although remedying past discrimination may have constituted a compelling interest at the time the Consent Decree was entered in 1981, the question is whether 40 years later the remedial race-based hiring and promotional goals actually serve to remedy that past discrimination at this point in time.  In *Cleveland Firefighters*, the Sixth Circuit held that "[w]hether a racial classification is supported by a compelling interest when first applied by a public employer, and whether it remains supported by such an interest 31 years later, are two different questions."  669 F. 3d at 742; *see also Ensley*, 31 F.3d at 1575–76 ("After thirteen years of racial preferences . . . the district court should consider the retrospective, remedial purpose of affirmative action satisfied except where it finds that past discrimination continues to taint a particular position.").  On remand the district court found that the consent decree's race-based hiring ratios did not withstand strict scrutiny.  *Cleveland Firefighters v. City of Cleveland*, 917 F. Supp. 2d 668, 682 (N.D. Ohio 2013).  The court found that there was no evidence of continuing discrimination by the defendant nor any evidence the race-based classifications remedied any on-going effects of past discrimination.  *Id.* at 681–82.  Indeed, the court referenced the success

9

achieved by the consent decree, with minority representation within the fire department

increasing from 4% to 26%, and the presence of minority leadership within the department.  *Id.*

Here, by merely stating that evidence of past discrimination by CPD over 40 years ago

justifies the use of remedial race-based classifications, the City fails to provide any evidence that

*at this time* the race-based hiring and promotional goals *continue* to remedy past discrimination

or any lingering effects therefrom.  Moreover, the City admits that efforts to diversify CPD have

been relatively successful, which has led to a lessened use of the double-fill over the past

decade,[9] and that the cumulative effect of the double-fills have been substantial because the

impact of each promotion compounds.  (Doc. 194 at PageID 83–84.)  Recognizing the positive

impact the race-based provisions have had on CPD's diversity, the City further admits that rates

of "African[-]American officers have held steady for the recent past," and that the Consent

Decree is used to "maintain diversity, not increase it."  (*Id.*)  As demonstrated by CPD's

demographics, throughout the past 40 years the racial composition of CPD has improved.  In

1980 only 9.9% of CPD's workforce was African American.  (Doc. 193 at PageID 57; Doc. 194

at PageID 78.)  And in January 2021, CPD's sworn workforce was 28.3% African American, the

police officer position was 31.3% African American, and the police sergeant position was 28.4%

African American.  (Doc. 194-1 at PageID 175; Doc. 197-1 at PageID 208–09.)

This Court finds that there is insufficient evidence that the Consent Decree's race-based

hiring and promotional goals remain remedial at this point in time.  The race-conscious goals

have remained in effect for 40 years and at this time are improperly utilized to maintain

diversity.  *See Johnson v. Transp. Agency*, 480 U.S. 616, 640 (1987) (affirming promotion of

employee pursuant to an affirmative action program where the program was not used to

---

[9] The Consent Decree has been used to promote six police sergeants since 2010.  (Doc. 194 at PageID 84.)

"maintain a permanent racial and sexual balance"); *cf. United States v. Sec'y of Hous. and Urban Dev.*, 239 F.3d 211, 219–21 (2d Cir. 2001) (upholding consent decree with race-conscious remedy where public housing remained "substantially segregated" despite 15 years of remedial efforts).  As such, the City has failed to carry its burden to demonstrate that at this time remedying past discrimination constitutes a compelling interest under a strict scrutiny analysis. *See Cleveland Firefighters*, 917 F. Supp. 2d at 682.

Next, the City claims it has a compelling interest in maintaining a diverse police department for purposes of "operational needs."  (Doc. 194 at PageID 79–82.)  It is critical to effective law enforcement, the City contends, that CPD reflect the population it serves so as to ensure public safety and increase CPD's legitimacy with the community.  (*Id.* at PageID 80.) This purported interest, however, also fails to withstand strict scrutiny.

The City contends that in *Detroit Police Officer Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979), the Sixth Circuit recognized a compelling interest in affirmative action programs to meet the operational needs of law enforcement.[10]  (Doc. 194 at PageID 80.)  Even assuming this purported interest can constitute a compelling interest in certain circumstances, the City fails here to sufficiently demonstrate or otherwise explain why an operational need for diversity is a compelling interest.  A claim of operational need "must be substantiated by objective evidence -- mere speculation or conjecture is insufficient."  *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 52 (2d Cir. 2002); *see also Reynolds v. City of Chicago*, 296 F.3d 524, 530 (7th Cir. 2002) (addressing operational needs claim and stating "[t]he imperative need for

---

[10] The court in *Young* did not determine whether the affirmative action plan at issue passed constitutional muster under strict scrutiny on the basis of "operational needs," but instead remanded the case to the district court to consider whether this was a sufficient justification for the plan.  608 F.2d at 697.  The district court never reached the issue as it decided the case on different grounds.  *See Detroit Police Officers Ass'n. v. Young*, Nos. 74-71838, 75-71376, 1984 WL 21763, at *2–6 (E.D. Mich. Dec. 27, 1984).

this discrimination had . . . to be proved and not merely conjectured.  It would not have done for

the City merely to have presented plausible argumentation or to have appealed merely to

common sense.  It had to substantiate its position with evidence.").  In support of its assertion,

the City broadly argues that in general, diversity in law enforcement is a compelling interest as it

ensures a police department's legitimacy, thereby enhancing the department's ability to prevent

and solve crime.  (Doc. 194 at PageID 79–82.)  While various studies suggest this is true as a

general proposition,[11] the City offers no evidence to substantiate its claim that CPD requires

greater diversity to improve its law enforcement efforts.

In contrast, in *Young* the court was presented with testimony from high-ranking police

officers regarding why a more representative African-American presence on the Detroit police

department was required.  608 F.2d at 695–96.  Among other things, diversity was needed to

"change an image of the police among black Detroit residents as part of the white establishment

with little interest in their problems."  *Id.* at 696.  The City also relies on the Seventh Circuit's

opinion in *Petit v. City of Chicago*, where the court held the Chicago police department had a

compelling interest in diversity.  352 F.3d 1111, 1115 (7th Cir. 2003).  Yet, unlike here, in *Petit*

the defendant presented "a strong basis to conclude that some rather modest affirmative action

promotions were necessary for the effective operation of the police department" given the

testimony of experts and department officials regarding Chicago residents' perceptions of the

Chicago police department and why greater diversity was needed in the department.  *Id.* at 1114–

15.

By broadly asserting a compelling interest in diversity for purposes of operational need

without offering any evidence regarding how diversity in this particular instance will allow CPD

---

[11] *See Young*, 608 F.2d at 695 (citing various national studies).

to improve its law enforcement efforts, the City is effectively asking this Court to disregard the strict scrutiny standard applied to race-based governmental action.  To accept the City's argument would mean every police department has a compelling interest in diversity, regardless of the circumstances surrounding the local community and department, thereby providing a blanket justification for relying on race-based employment practices.  This *carte blanche* proves too much.  Accordingly, the City fails to carry its burden as to why its operational needs for diversity is a compelling interest.

As neither asserted interest constitutes a compelling interest justifying the use of race-based classifications, the Consent Decree must be modified by removing the race-based hiring and promotional goals.  Because the City has failed to present a compelling governmental interest, it is unnecessary for this Court to consider whether the race-based hiring and promotional goals are narrowly tailored.[12]

### ii.    Sex-Based Hiring and Promotional Goals

The Court next turns to the Consent Decree's sex-based hiring and promotional goals.  Unlike racial-classification jurisprudence, at the time the Consent Decree was entered the Supreme Court had already established that sex-based classifications are subject to intermediate scrutiny under the Equal Protection Clause.[13]  *See Craig v. Boren*, 429 U.S. 190, 197 (1976); *see*

---

[12] The Court notes, however, that the duration of a race-conscious remedy is a critical factor when analyzing whether such remedy is narrowly tailored.  *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 342 (2003) ("[R]ace-conscious admissions policies must be limited in time."); *Rutherford*, 179 F. App'x at 380 ("Courts view with disfavor those affirmative action plans that are not temporary and do not terminate when the identified racial imbalances have been eliminated."); *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993) ("Limiting the duration of a race-conscious remedy . . . is a keystone of a narrowly tailored plan . . . ."); *Cleveland Firefighters*, 669 F.3d at 738 ("Race-neutrality is the promise of the Equal Protection Clause; and the law permits a public employer to depart from that rule only reluctantly, in circumstances limited in both scope and duration.").

[13] As the parties note, the Sixth Circuit has previously applied the strict scrutiny standard to sex-based affirmative action programs.  *See Brunet v. City of Columbus*, 1 F.3d 390, 404 (6th Cir. 1993).  Recently, the Sixth Circuit indicated it is unclear whether strict scrutiny is still applicable in these instances in light of the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515 (1996).  *Vitolo*, 999 F.3d at 365 n. 3.  Because the Court finds the

*also Rucker v. City of Kettering*, 84 F. Supp. 2d 917, 922–23 (S.D. Ohio 2000).   Nonetheless,

*Rufo* instructs that a consent decree's provisions must continue to comply with present

constitutional standards.  *See Rufo*, 502 U.S. at 388 ("A consent decree must of course be

modified if, as it later turns out, one or more of the obligations placed upon the parties has

become impermissible under federal law."); *see also Cleveland Firefighters*, 669 F.3d at 742

("The Constitution trumps a consent decree."); *Ensley*, 31 F.3d at 1564 ("*Rufo*'s second prong

requires that consent decrees be modified to avoid any violations of governing constitutional

standards.").  The Court therefore must determine whether the Consent Decree's sex-based

hiring and promotional goals satisfy intermediate scrutiny.

Under intermediate scrutiny, the party defending sex-based government action is required

to demonstrate an "'exceedingly persuasive justification' for that action."  *United States v.*

*Virginia*, 518 U.S. 515, 531 (1996).  This burden is satisfied by showing the classification serves

"important governmental objectives [or interests]" and "the discriminatory means employed are

substantially related to the achievement of those objectives."  *Miss. Univ. for Women v. Hogan*,

458 U.S. 718, 724 (1982) (internal quotations omitted).  The City argues the sex-based

classifications are justified by the two purported interests of remedying past discrimination and

maintaining a diverse police department.  Although sex-based classifications are subject to a less

stringent standard, the Consent Decree's sex-based hiring and promotional goals do not pass

constitutional muster for the same aforementioned reasons.

First, the City fails to demonstrate that remedying past discrimination against women

continues to constitute an important governmental interest at this time.  In "limited

circumstances," a sex-based classification favoring one sex can be justified if the members of the

---

Consent Decree's sex-based hiring and promotional practices do not withstand intermediate scrutiny, and therefore could not survive the more exacting strict scrutiny standard, the Court does not address this apparent tension.

benefited classification "actually suffer a disadvantage related to the classification." *Hogan*, 458

U.S. at 728.  One such situation is where the sex-based classification is used to remedy a prior

pattern or practice of discrimination.  *Brunet v. City of Columbus*, 1 F.3d 390, 408–09 (6th Cir.

1993); *see also Jones v. Memphis Light, Gas & Water Div.*, 642 F. Supp. 644, 658–59 (W.D.

Tenn. 1986).  Here, the City asserts that evidence of past discrimination from over 40 years ago

justifies the continued use of the sex-based hiring and promotional goals.  (Doc. 194 at PageID

78–79.)  Given the significant passage of time, remedying past discrimination no longer

constitutes an important governmental interest.  In *Brunet*, the Sixth Circuit held that the

defendant's discriminatory policy against females prior to 1975 was "too remote" to justify a

1989 consent decree's affirmative action plan.  1 F.3d at 408–09.

 Here, as explained above, evidence of prior discrimination from over 40 years ago is too

remote in time to provide an important governmental interest in remedying said discrimination.

The City has not presented any evidence regarding any unremedied or current discrimination on

the basis of sex and, instead, now relies on the Consent Decree to "maintain diversity."  (Doc.

194 at PageID 84.)  In 1980 only 3.4% of CPD's workforce was female (Doc. 193 at PageID 57;

Doc. 194 at PageID 78), but in January 2021, CPD's sworn workforce was 22.9% female, the

police officer position was 23.9% female, and the police sergeant position was 15.3% female.

(Doc. 194-1 at PageID 175; Doc. 197-1 at PageID 208–09.)  As such, the City fails to carry its

burden to establish an important governmental interest in remedying past discrimination.

 Second, the City argues the need to maintain a diverse police department justifies the sex-

based hiring and promotional goals.  Yet as explained above, aside from generalized reasons why

diversity in police departments is beneficial, the City presents no specific evidence as to how

greater female representation in CPD will allow CPD to improve its law enforcement efforts.

15

This amorphous claim of operational needs, without more, is insufficient to constitute an important governmental interest, or otherwise sex-based preferences would be able to continue into perpetuity.  *See Ensley*, 31 F.3d at 1581–82 ("Perpetual use of affirmative action may foster the misguided belief that women cannot compete on their own.  That notion is just as pernicious and offensive as its converse, that women ought to be excluded from all enterprises because their place is in the home."  (internal quotations omitted)).

The City has failed to present any important governmental interest to justify the Consent Decree's sex-based hiring and promotional goals.  Accordingly, those provisions are unconstitutional and must be stricken.  As the City has failed to present an important governmental interest, the Court need not consider whether the sex-based hiring and promotional goals are appropriately tailored.

## IV.    CONCLUSION

It is hereby **ORDERED** that the Consent Decree shall be modified by removing the race-based and sex-based hiring and promotional goals identified in paragraphs 2(A)-2(B), 3(B)(4), 3(C)(4), and 5.  It is further **ORDERED** that the parties shall confer regarding the need for the entry of a modified Consent Decree in light of this Order and **ORDERS** the parties to submit any proposed modified Consent Decree within 90 days.

**IT IS SO ORDERED**.

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court

16